Moncure, P.,
delivered the opinion of the court.
The two main questions arising in this case are, first: whether the sale made by Gustavus A. Myers, one of *275 the two trustees named in the deed of trust of the 15th day of February 1860, from John Graeme to said Myers aiid John Graeme, jr., for the benefit, of Patrick Cullen, was a valid sale? -And second: whether Cullen is entitied to have full satisfaction of his debt secured by that deed, out of the proceeds of that sale, before S. H. & F. Adams, the builders of the house winch was upon the lot of ground sold at the time of the sale, will be entitied to any part of the said proceeds on account of the debt due to them by said Graeme for said building? These two questions, substantially, in the above order, were considered by the learned judge of the court below, in the opinion delivered by him on pronouncing the decree appealed from in this cáse, and were discussed by the able counsel in their argument of the case before this court. We will, therefore, consider the same questions, and in the same order, in our examination of the case. Other questions arise in the case which were considered in the court below, and were argued by counsel in this court, and which we will also have to consider; but they are subordinate and collateral to the main questions aforesaid. Proceeding, then, to consider those two main questions, we will enquire :
First—-Was the sale made by Myers, as aforesaid, a valid sale ?
The law in-regard to the power of one of two or more trustees, named in the instrument creating the trust, to execute the trust severally, is very plain, and is familiar to us all. Where two or more persons are authorised to execute a trust or power jointly, of course they are not authorised to execute it severally, unless such authority be also given by the instrument creating, the trust or power. That instrument being the only source of the authority, of course there can be no authority which does not flow from that source. Levin on Trusts, 266, *276 marg.; 1 Lom. Dig. 249. A trust or power given to two or more, is joint only, unless words be added making it severed also. But while one or two or more joint fcrus^ees caunaj. execute the trust severally, it is perfectly competent for the author of the trust to empower the to act severally, as well as jointly; and in that cagej the act of one of the trustees, in pursuance of the trust, is just as valid as if he only had been appointed to execute it. The law on this branch of the subject is correctly laid down in the opinion of the court below and the authority therein cited. By the terms of the instrument creating the trust, its author “may confide the execution of the trust to one person alone, or to two or more jointly, or to two or more jointly and severally; and in the latter case, one of the trustrustees alone, or a less number than the whole, may execute the trust where the deed provides that less than the whole number may act. 1 Lom. Dig., marg. p. 825. ’When there are several trustees, and there is no provision in- the deed that a less number than the whole may act, all must act; because it is an office of personal confidence, (Lewin 262,) and in such case the grantor has not confided in any one, or in any number less than the whole. But, when the deed does provide that a less number may act, it is a clear indication that the grantor has the same confidence in the lesser number that he has in the whole; and it follows, that in such case it is competent for a less number than the whole to execute the trust.” The ease of Taylor & ux. v. Dickinson, &c., 15 Iowa R., 483, cited by one of the counsel for the appellee Cullen, bears directly on this branch of the case, and seems to be a correct decision. Then, the question in regard to the power of Myers to act severally in making the sale,- is one of construction merely. Does the deed of trust confer such power ?
*277 The deed was executed to secure the purchase money, or part of the purchase money, of the lot of ground thereby conveyed, which it seems, on the same day had been sold and conveyed by Cullen to Graeme. The amount secured by the deed was $22,200, for which Graeme executed and delivered to Cullen thirty writings obligatory, for different sums of money, payable at different times, between the 15th day of February 1860, the date of the deed, and the 15th day of February 1875, inclusive, according to schedule annexed to the deed. The deed provides, that in the event that default shall be made in the payment of either of the above mentioned writings obligatory as they become due and payable, then the trustees or either of them, on being required so to do, by the said Patrick Cullen, his executors, administrators or assigns, shall sell the property hereby conveyed.” Certainly language could not be plainer, nor more unlimited and unconditional, than is the language here used to empower the trustees, severally as well as jointly, to make the sale, on being required so to do as aforesaid. The power thus given to either of the trustees to make the sale, is not a conditional power to make, it only in the event of the death of the other trustee, or of his non-residence in the State, or. of his refusal to accept the trust, but it is general and unconditional; just as much so, as is the power given to them to act jointly in the matter. How then can it be said, that Myers had not power to make the sale severally in this case? Suppose both of the trustees had signed the deed of trust, (though neither of them did,) that would have been the most express and binding acceptance of the. trust which the trustees could possibly have given; and yet, could it have been contended in that case, that one, of the trustees could not have made the sale on being required by the trust creditor to do so, notwithstanding *278 the refusal of the other trustee to join in making it ? How then can it be said that by joining in the-first advertisement of sale, Graeme, jr. accepted the trust, and thereby put it out of the power of Myers, afterwrards, malce the sale severally, though Graeme, jr. was ex-requested and expressly refused to join in mak}ng ft? j)id Graeme, jr’s. acceptance of the trust, and Mis refusal afterwards to join in makiug a sale, annul that portion of the deed which expressly requires either of the trustees to make the sale, on being required by the trust creditor to do so? It may be true that in the selection of the trustee, the trust debtor and creditor ma.y have been influenced, to some extent, by the consideration, that one of them was the son of the debtor, aud the other the friend, if not counsel of the creditor; (though it seems lie was only such counsel in drawing the deed, and not the general counsel;) but it was certainly not intended that the trustees should only act together, and not severally; for the deed expressly provides otherwise. The parties were friendly at the time of the execution of the deed, and did not anticipate any difficulty in the future. But the debts to be secured had a long time to run, covering a period of fifteen years; and the parties could not know what would turn up in the meantime. It was a prudent precaution, therefore, in the trust creditor to stipulate in the deed for a right to require the trustees or either of them to make a sale, in the event of a default by the debtor in making his payments. Before all the debts became payable, the parties, debtor and creditor, might become inimical to each other, (as turned out to be the case,) and the trustee, who is a son of the debtor, might naturally take sides with his father, and be biased in his favor; and might think it improper, to join in making a sale, and therefore refuse to do so. In such an event, it was *279 important to tbe creditor to have the right to require the other trustee to make the sale, and the right was accordingly secured to him by the deed. "We do not mean to ® " ... say that this was the gnly motive for inserting that provision in the deed. On the contrary, there were many other motives for its insertion. But this may have been of the motives, and was a reasonable one; and at all • events, such a state of things presents a case in which either of the trustees may be required to make a sale, notwithstanding the refusal of the other trustee to join in making it, and even against his protest, if such sale would be otherwise proper. "We do not mean to say that one of the trustees might have been required to make the sale alone, if the other had been willing to join him in making it. It is unnecessary to decide that question in this case, and we therefore express no opinion upon it. But we do mean to say, that if one refuse, though requested to join in making a sale, no matter what may be the motive of such refusal, the other has power to make it; and if it be otherwise proper, the sale will be valid. In this case Graeme, jr., was requested to join in making the sale; and he did join in the first advertisement; but he refused to join in the second. After being made trustee in tbe deed for the benefit of Cullen, he accepted another trust upon the same property for the benefit of S. H. and J. F. Adams. These trusts were, in his opinion, conflicting, and he could not decide between them, “ and what right,” enquires the petition, “had Cullen, or Myers either, to require him to assume the grave responsibility of so doing?” This may have been a very good reason for his refusing to join in making the sale under the deed for the benefit of Cullen; but it was at least as good a reason, why Myers should have power to make the sale alone, if such a sale would otherwise be proper.
*280 Then we proceed to enquire, whether the sale was otherwise proper; in other words, whether it is valid, notwithstanding the fact that both trustees did not ioin J m making it ?
The sale was advertised and made in strict pursuance of the terms prescribed by the deed of trust. There wag n0 uncertainty as to the amount due on account of the trust debt at the time of the sale. The debtor had made default in the payment of the instalment which became payable on the 15th of February 1864, and of all the semi-annual instalments which became payable afterwards, down to the time of the sale on the 22d of May, 1868, and had paid nothing on account of the principal or interest of the debt during all that period: The title to the property was perfect, and there was no cloud whatever over it, at least at the time of the execution of the deed of trust. The deed was duly recorded a few days after its date. The creditor was prevented by the stay law from having the deed of trust enforced by a sale of the property, until after it was decided by this court in Taylor v. Stearns, &c., 18 Gratt. 244, that so much of that law as suspended the enforcement of deed of trust liens ivas unconstitutional; which decision was made in 1868, February 19. Shortly thereafter, the sale was advertised and made as aforesaid. It does not appear, and is not pretended, that the trustee did not use every means in 1ns power to make the property produce the highest possible price at the sale. On what ground, then, can it be, that the said sale is invalid ?
The ground on which the appellants insist that it is invalid is, that at the time it was made there was a pending controversy in regard to the improvements which had been constructed upon the said property by S. H. and J. F. Adams; that is to say, whether the pro *281 ceeds which, might arise from the said sale, on account of the said improvements, would be properly applicable, in the first place, to the payment of the trust debt due to Cullen, or to the payment of the debt due to the Adams’ for said improvements; for the security of which latter debt a subsequent deed of trust on the said property had been executed and recorded. The appellants contend that this controversy, in itself, (however the right may be,) was such a cloud over the title as made it improper in the trustee to make the sale until the said cloud was removed; and that the necessary effect of making the sale, under such a cloud, was to produce a sacrifice of the property. We will now enquire as tó the nature of this supposed cloud, and as to its probable effect upon the sale.
The question now to be considered is, not how the proceeds of the sale of the. property ought to be applied —-that will be the subject of our next enquiiy—but what was the nature and state of the eontrovei’sy on the subject at the time of the sale, if controversy it could be called; and whether it injui’iously affected the sale.
It is manifest, we think, that when the agreement of the 18th of November 1865, between Graeme,' James Hunter and the Adams,’ providing for a lien to be given to the Adams’ on the property therein mentioned, to secure the payment of the cost of the improvements, which had been and were expected to be put upon the said property, all of the parties to said agreement believed that Cullen would have a prior lien to that of the Adams’, not only on the lot of ground conveyed by the deed of trust for Cullen’s benefit, but also on the improvements which had been, or might be, put upon that ground, as aforesaid. And this belief, no doubt, continued down to the time of the advertisement of the property for sale by Graeme, jr. and Myers, the two' *282 trustees under the said deed of trust. But afterwards a change seems to have occurred in the views of the said parties. That change in the views of Grseme, sr., mauifested itself by the bill which, on the third or fourth of March 1868, just three or four days before the day fixed by the trustees for the sale of the property, was presented ^ie 0f the Circpit court of the City of Biclimond, praying for an injunction of the said sale, upon the ground of the alleged, or supposed, prior lien of the Adam’s to that of Cullen, on the improvements aforesaid, and of the injurious effects of making a sale of the property under such a supposed cloud. The injunction prayed for, was refused b;y the Judge of the Circuit court on the 4th of March 1868, but was granted by a judge of this court on the 10th of March 1868, and the sale advertized to be made on the 7th day of the same month was not made. Cullen filed his answer to the bill, and gave notice to Grseme that he would, on the 28th of the same month, move the judge of the said Circuit court to dissolve the injunction: which motion was accordingly made. And on the 11th day of April 1868, to which day the said motion was continued by consent of parties, it came on to he heard by the said judge in vacation, on the original hill, the answers of the defendants Cullen, Myers, and S. H. & J. IF. Adams to the said original bill, with general replication to said answers, the answer of the defendant Mary Hunter on that day filed, the amended and supplemented bill (making said Mary Hunter a defendant to the suit,) the exhibits filed and the depositions of witnesses, and was argued by counsel: On consideration whereof, the said Judge in vacation adjudged, ordered and decreed that the said injunction should be, and the same was thereby dissolved. And on the motion of the plaintiff by counsel, who represented that he desired and intended to present *283 a petition for an appeal from the said decree, it was further ordered that the said, decree be suspended for thirty days from its date, to enable the plaintiff to present such petition. Ko such petition ever was presented; or, at all events, no such appeal ever was obtained. After the said period of thirty days had expired, to on the 12th of May 1868, Myers, as sole acting trustee, again advertised the property for sale, in pursuance of the terms prescribed by the deed of trust, on the 22d day of the same month. Before proceeding to act as sole trustee in advertising and making the sale, Myers, on the 11th of May 1868, sent the advertisement to his co-trustee, Graeme, jr., with a note requesting him to sign it. The latter replied by a note dated on the same day, in which he said: “as ca-trustee alike in the deed from John Graeme, to secure Messrs. S. H. aud J. F. Adams, and in the deed from said Graeme to secure Dr. Cullen, both of which trusts I have accepted, I am advised by counsel, that under the circumstances, it would not be proper or safe in me to unite with you in the sale of the house erected on the lot in question by Messrs. Adams, to pay the debt due to Dr. Cullen, or to consent to such sale by you, my co-trustee, in said deed to secure Cullen. I therefore notify you that I can not consent to the sale proposed to be made,, the advertisement of which was submitted to me to-day, and shall decline to do any act to divest the .title in me, in part, under said deed, in order to effectuate the said proposed- sale. Any expenses, costs, or damages that may be- incurred by reason of an attempt to make such sale by you, will of course be assumed by yourself, and on your own responsibility ; and such a sale would be regarded by me, co-trustee in said several deeds, as an act-done without lawful authority, and therefore null and void, &c.” The writer also appended to the said advertisement of *284 Myers in the newspaper, a notice signed by himself, in which he stated: “I have notified Mr Gr. A. Myers, under advice of counsel, that I could not safely consent to gaje aclyeptised by him to take place on the 22d instant, and that such sale would be regarded by as illegal, and therefore null and void.” It seems also that he attended the sale, and then and there gave a similar notice, arid that he had been notified by his sister, Mrs. Mary Hunter, executrix and sole devisee of James Hunter, “ not to unite in such a sale; that she would regard the same as a null and void act, so far as it aftected her rights; and that she would hold him personally responsible for any damage that might accrue to her by reason of his uniting in or giving any countenance to such a sale.” Myers, however, made the sale, according to his advertisement; and S. H. & J. F. Adams, beiug the highest bidders, became the purchasers at the price of twenty thousaud dollars. It does not appear that that was not an adequate price for the property at that time, on the terms on which it was sold; which were the terms prescribed by the deed of trust. Real estate in Richmond had considerably fallen in market value, since 1865 and ’6, and it was uncei'tain whether there would not be a still further fall therein. The property might have produced more if sold on different terms; or rather if a less amount of cash had been required; but it certainly does not appear, nor is there any evidence in the case, that more could have been gotten for it on the same terms. The trustee properly sold it on the terms prescribed by the deed, which he had no right to vary. The amount of the cash payment required was quite large, hut it was made so by the long, continued default of the debtor, which accumulated the amount in arrear. But still, the terms were favorable in regard to the portion of the purchase money *285 required to meet the instalments of the debt which had not become payable, and which were to run to February 1875, nearly seven years after the sale. Then was this sale valid, under these circumstances?
"We are of opinion it was. There was no cloud over the title at the time of the sale. The only controversy which then existed, if any, was as to the application of the proceeds of the sale. The injunction of the sale which had been granted by a judge of this court after having been refused by the Judge of the Circuit court, had been dissolved by the latter, and no appeal had been taken fiun the order of dissolution. There was then no impediment in the way of a sale, and no reason for believing that a fair sale could not be made, at as full a price as could be obtained for such property, at that time and on the terms prescribed by the deed. There had'been no decree dismissing the injunction suit after the injunction was dissolved, and it was a pending suit at the time of the sale; but it was pending only for the purpose, if any, of having the proceeds of the sale applied according to the respective rights of the claimants, as they might thereafter be determined by the court. Grseme’s suit against Cullen (the injunction suit) was the only one óf the four suits in which the decree appealed from was rendered, which had been brought, or, at least, in which a bill had then been filed; and the injunction awarded in that suit had been dissolved. To be sure, it seems that Mary Hunter, executrix and sole devisee of James Hunter, on the very day on which the injunction was dissolved, sued out the sub-, poena which was the commencement of the suit of “Hunter v. Johnston, &c.,” which was one of the said four suits; but no bill was filed in the suit until the 7th day of September, 1868, nearly four months after the sale. If the property did not in fact, produce a full *286 Price,it was owning, doubtless, to the means used by the debtor Gi’teme, sr., his son, one of the trustees, Graeme jr., and his daughter Mary Hunter, to prevent trustee Myers from making a sale, after the court, by dissolving the injunction had decided that was no impediment in the way. It was their duty then to do every thing in their power to promoté a good sale; and it was their interest also, except so far y. may have been more to the interest of Graeme, the debtor, to postpone the sale as long as possible, in order that he might, in the meantime, continue to receive and enjoy the rents of the property. If the sale was injured by the ■ course pursued by them, they, surely, have no just cause to complain. See Ford v. Heron, 4 Mnnf. 316, cited by one of the counsel for Cullen. The Messrs Adams do not complain. But the property sold for a fair price, considering the time at and the terms on which it was sold. The Messrs. Adams in their answer to Mrs. Hunter’s bill, deny that the sale was made under such circumstances of difficulty and cloud as to title, that fair competition for it, at its real value in the market, was excluded.” And they “aver, on the contrary, that the price bid for the' said property by them, and at which the said property was struck off to them, as the highest bidders therefor, was, in fact, the full market value of the said property, supposing the title to be conveyed to be a full and complete title in fee simple, without any cloud or difficulty whatever.” And they say they were induced to offer a full price for the same, in order to save themselves, as far as possible, from loss; and relying upon the judgment of the court to make such distribution of the purchase money as should be consistent with their rights and those of the said Patrick Cullen.” And Mrs. Hunter herself, in her answer to Cullen’s bill for the appointment of a receiver, in *287 Cullen v. Graeme, one of the said four suits, manifests her willingness and indeed suggests that the purchase money should be paid into bank to the credit of the cause, which she is advised, it would be entirely competent for the court to do, and respectfully suggests that it ought to do; and then a conveyance may be made the purchaser.” Thus showing that the real controversy on her part, was not as to the propriety or fairness of the sale or the adequacy of the pihce, but as to the proper application of. the proceeds. We can readily see how the existence of a controversy between Cullen and the Adams’ as to the proper application .of the proceeds, might enhance the price of the property at the sale, by producing a competition between these parties as bidders. This case is very different from the cases cited by the couusel for the appellants to show, that property should not be sold by a trustee while there is a cloud over the title. The difference will readily appear by a comparison of the circumstances of this case with those which existed in them. The eases referred to are Rossett v. Fisher, 11 Gratt. 498; and Roberts v. Roberts, 18 Id. 639. We proceed now to enquire:
Secondly—Is Cullen entitled to have full satisfaction of the balance due to him by Graeme, out of the proceeds of the sale of the said lot of ground with, the building thereon, before S. II. and J. F. Adams will be entitled to any part of the said proceeds on account of the balance due to them by Graeme for said, building.
It is a general rule of law, that the owner of land owns every thing annexed to it. Cuius est solum, ejus est usque ad caelum, is a well established and familiar maxim of the law. To this general rule, there seems,originally, to have, been few or no exceptions. But there are now many exceptions to it, as well established aa the rule itself; though there is some uncertainty, and *288 apparent confficf in the cases, as to the extent of some of these exceptions; audit is sometimes difficult to deter-whether a particular case comes within any of them. Most of these exceptions arise under the law in regard to w-ha* are ca,Pe(i “fixtures; ” which law has undergone change in modern times, as trade has increased and its necessities and conveniences have required a modification of the law. The decision of Lord Ellenborough in Elwes v. Maw, 8 East’s R. 38, is a celebrated case on this subject. He considers it under three heads: 1st, as between heir and executor; 2dly, as between executors of tenant for life or in tail, and the remainderman or reversioner; and 3dly, as between landlord and tenant. This case may be found in 2 Smith’s Leading Cases p. 117 top and 228 marg.; and in it and the notes appended thereto both by the English and American publishers qf that valuable work, all the authorities having any material bearing on the subject are referred to. These authorities show how carefully the law in regal'd to these exceptions, guards the inheritance against injury by the removal of fixtures, even where they are annexed by a tenant for the purpose of trade; in which case the right of such removal is most favored by the law. The removal must he effected during the possession of the tenant and without any substantial injury to the freehold. But it is unnecessary to comment further on the cases which relate to the law of fixtures, as that law has no direct application to this ease. The building erected by the Adams’, on the lot of ground conveyed by the deed of trust, to secure the debt due by Graeme to Cullen, is certainly not a fixture, within the meaning of that law; and if the parties, Graeme and the Adams’, or Cullen and the Adams’, stood towards each other in the relation of landlord and tenant, the Adams’ would not have a right to remove the *289 building without the consent of Graeme and Cullen, according to any of the authorities in regard to fixtures. Indeed no such right is claimed in this case. The right claimed here by the Adams’ is, to have so much of the proceeds of the sale aforesaid as arose from the building applied, in the first place, to the payment of the due to them for erecting the said building; upon the ground, first, that they contracted to do the work without any knowledge of the existence of the deed of trust for Cullen’s benefit, and on the terms that the price of the work should be secured to them by a lien on the said lot when the building should be completed; and also upon the ground, secondly, that Cullen was aware that they were doing the work, relying on such security, and yet failed to inform them of his deed; and so was guilty of a fraud, by reason of which Ms lien will be postponed by a court of equity to theirs, blow, let us see whether these two grounds, or either of them, be sufficient to sustain their claim.
But before we consider them separately, we will make some general observations which apply to them both. And first—all buildings and other improvements and fixtures put upon mortgaged premises by the mortgagor, after the execution of the mortgage, become a part of the freehold, and enure as such to the benefit of the mortgagee. There are a great many authorities on this subject, but no conflict among them. All affirm or recognize the principle just stated. It is, perhaps, no where more clearly stated than by Chief Justice Shaw, in the case of Butler's adm'r v. Page, 7 Metc. R. 40, referred to in the opinion of the chancellor in this case: “All buildings erected, and fixtures placed on mortgaged premises, by the mortgagor,” says the Chief Justice, “must be regarded as permanently annexed to the freehold; they go to enhance the value of the estate, and will, therefore, *290 enure to the benefit of the mortgagee, so far as they increase his security for Ms debt; and to the same extent, they enhance the value of the equity of redemption, and thereby enure to the benefit of the mortgagor. Winslow v. Merchants Ins. Co. I Metc. R. 306. There is no necessity to adopt any liberal rule in regard to fixtures enable the mortgagor to remove what he has erected at his own expense; because he has the full benefit of ^ guek improveraents when he regains the estate by redemption, which he may do simply by paymeñt of his actual debt. The general rule of the common law, therefore, that what is fixed to the freehold becomes part of the realty, and passes with it, has its full effect in re-gard to things erected on the land by an owner who ubsequently mortgages the land, and also in regard to things erected by the mortgagor after the mortgage. It was argued that a mortgagor in possession is tenant to the mortgagee, and the authorities were cited to show that temporary buildings erected by a tenant at his own expense may be removed. This we think is founded on a fallacy.” Hobody ever contended that permanent buildings, erected by the mortgagor, or at his expense, could be removed by Mm, or that the mortgagee could be compelled to account for them, or the proceeds of the sale of them, at least until the mortgage debt was fully paid. The counsel for the appellants admit the correctness of this principle. And they do not deny, but in effect admit, the correctness of what is further said by the chancellor on this subject, (which is undoubtedly true,) that “there is no difference in this respect between a deed of trust and a mortgage, but the principle is equally ■ applicable to both. 2dly: It will be observed, that on the 21st day of February 1860, just six days after the date, of the deed of trust for Cullen’s benefit, it was duly recorded in the office of the court of Hustings for *291 the city of Richmond, the place prescribed by law for that purpose; and Cullen thus did every thing required of him by law to give public notice of his lien upon the land. 3dly: It will be observed, that there was no time, at or after the commencement of the building on the land by S. H. and J. F. Adams, when they could not have seen the deed of trust by enquiring at the said office; which was situated only a few hundred yards from said land; and yet they made no such enquiry, until after the work had been more than half done. They did not even enquire of Graeme, nor any body else, whether there was any lien upon the land; nor did Graeme give them any, the slightest, information on that subject. They seem to have dealt with him in perfect confidence in his ability and willingness to make good his engagements; and he seems not to have doubted, that the property, subject to the prior liens upon it, would be ample security for the cost of the improvements about to be erected on the land. The high price of such property in Richmond at that time, and the prospect of its continued increase in value, afforded a just foundation for such an opinion. 4thly: It will be observed., that until after the improvements were completed, not a word was said to Cullen about them, either by Graeme, or. by S. H. and J. F. Adams, or by any body else; and even after the Adams’ were informed of the existence of Cullen’s lien, they did not go to him to have any negotiation about the continuance of the work, but went to Gneme and demanded of him further security, in consequence of that prior lien; and accordingly, such furthér security was given, by a lien on additional property of Graeme, and by Hunter and wife; the son-in-law and daughter of Graeme joining him in the conveyance of their property as such security. The parties concerned thus admitting, by acts if not by words, that Cullen’s lien *292 was prior and paramount to that of the Adams’ on the Pr0Per*y conveyed by the deed of trust, including all the improvements thereon. Audit does not appear that ' there was ever any claim or pretension to the contrary, until after the trustees named in that deed had advertised a sale properly in pui’suance thereof; and then a bill of injunction was filed by Graeme as aforesaid. g^. observed, that notwithstanding the destruetion by fire, of the building which stood upon the land when the deed of trust was executed, and until the 3d of April 1865, such was the favorable location of the ground, and such was the high market value of the property for one or two years after the war, that it could have been sold for enough, during that period, without any improvements thereon, to have paid the balance of the debt due to Cullen. He would have had it sold under the deed of trust, but was prevented from doing so by the stay law. Graeme could have sold it if he would, notwithstanding the stay law, but he would not; and preferred to have a new building erected thereon and take the chances of deriving greater benefit from the property, in that way. In November 1865, Cullen sold his own lot on the same square at a price, which Goddin regarded (“ all things considered,”) as the highest sale ever made in Richmond. Under all these circumstances, the parties must stand upon their legal rights; Cullen on the one side; and Graeme, Mrs. Hunter and the Adams’ on the other; and the law must determine whether Cullen is entitled to the priority which he claims for his lien, as well in regard to the improvements on the land as in regard to the land itself. And now we address ourselves to the several considerations of the two grounds relied on as aforesaid, to show that Cullen is not entitled to such priority, at least in regard to the improvements. And,
*293 First, as to the ground that the Adams’, without any actual knowledge of Cullen’s lien, contracted to erect the building, upon an understanding or agreement with Graeme that a lien should be given on the ground and improvements for the cost of the wrork, and that the greater part of the work was done before they had such knowledge.
We have seen that the general rule of the ommon law is, that all buildings and other fixtures annexed to the freehold become part of it, and enure to the benefit of those who are entitled to it; and that this rule applies to property subject to a deed of trust or mortgage. Flow, any exceptions which may be set up to this rule, either under any statute or under any established principle of law or equity, must be clearly made out by the party who seeks to have the benefit of them. If the building had been erected in this case under a contract with Cullen, or under a license from him, there would have been no doubt that his lien would have been postponed to the lien for the cost of the building. But such was clearly not the case, and no such fact is pretended.
The statute law gives a lien or claim for improvements against the owner of the land on which they are made, in certain cases and under certain circumstances. The Code, ch. 119, p. 567, gives what is called the “mechanic’s lien, on buildings in towns.” The 2d section provides, that “ If a person owning, or having interest in land, in a city or town, shall, by writing signed by him, contract with another, to pay him money for erecting or repairing any building, &e., on such land, there shall be a lien for such money on the whole interest of the said person in such land, from the time that the said writing is duly admitted to record in the county or corporation wherein the said land lies. But the said lien shall not be in force more than six months from the time when the money, or *294 the last ei'it of the money to be paid under sucli contract shall become payable, unless a suit in equity to enforce the lien shall have been commenced within the said six months. If in such suit the lien be established, coul’t shall order a sale of such interest in the said land, satisfy the money which ought to be paid under such contract.” It is not pretended that there is any lien in this case under that statute. Some of its most important provisions were not complied with, and indeed were not intended to be complied with, as the parties had not that statute in their view, and had no idea of stipulating for a lien under it. There was no contract in writing for a lien until after the builders were informed of Cullen’s .deed of trust; and the contract then entered into never was recorded at all, though such lien can only take effect “ from the time that the said writing is duly admitted to record.” But, what is most significant and instructive in this statute is, that it confines the right to give such a lien only to the interest of the person who contracts with another to pay him money for erecting or repairing any building, and does not authorise a lien to be given on the interest of others in the land, although they may be much more interested therein than the party who has the building erected or repaired. Therefore, Graeme had no right, under the statute, to hind Cullen’s interest in the land, even if he had intended to do so; which he did not.
The only other statute law which gives a lien for improvements, is that to be found in ch. 135 of the Code, concerning the action of ejectment §§ 30-34, p. 612; and in ch. 136 concerning “allowance for improvements,” p. 613-616. This latter chapter, which embraces all the material provisions of the two relating to the subject we are now7 considering, introduced a new principle into the law of Virginia, and was taken by the revisors and the *295 joint committee of revision in framing the Code, substantially from the revised statutes of New York and Massachusetts: Bee Code, p. 618, note. But they do not apply to this case. They are confined to cases of ejectment, or cases in which a decree or judgment is rendered against any defendant for land. And ch. 136, § 1, provides that such defendant may, at any time before the execution of the decree or judgment, present a petition to the court rendering such decree or judgment, stating that he or those under whom he claims, while holding the premises under a title believed by him or them to be good, have made permanent improvements thereon, and praying that he may be allowed for the same, over and above the value of the use and occupation of such land; and thereupon the court may, if satisfied of the probable truth of the allegation, suspend the execution of the judgment or decree, and empanneh a jury to assess the damages of the plaintiff-and tbe allowances to the defendant for such improvements.” Subsequent sections of the chapter give a lien on the land to the defendant for any balance due to him on account of such improvements; and also give to the plaintiff, in such a case, a right to have tbe value of his estate in the premises, without the improvements, ascertained, and to elect to relinquish bis said estate to the defendant, at the value so ascertained, instead of paying him the balance aforesaid. But these statutes have no application to this case, and apply only to a case against a defendant for land which he bona fide claims as owner thereof, under a title believed by him to be good, and on which he has made improvements under such belief. Here the building was not erected by a person in possession of the land claiming it under a title believed by him to be good; but was erected by a person not in possession, nor claiming any title to tbe land, who erected it under a' contract made *296 with Graeme Who could set up no claim against Cullen, for whose benefit lie had conveyed the land, by deed of duly admitted to record. But the 9th section of ch. 136 expressly declares that “nothing in this chapter nor any thing in the 135th chapter, concerning rents, and improvements, shall extend or apply to any gu^ fought by a mortgagee, or his heirs or assigns, against a mortgagor or his heirs and assigns, for the recovery of the mortgaged premises.” ¥e think, therefore, that these chapters can afford no ground for the claim of priority of lien asserted in this case by or for the Adams’.
There being nothing in the statute law to sustain the claim, let us now see if there be any established'principle of law or equity which can sustain it.
If there he any such it must be found laid down in Story’s Eq. Ju. §§ 385-390; or in 2 Id. §§ 799 a, 799 b, and 1237 and 1238 ; all of which sections were cited and much relied on by the counsel for the appellants. The sections cited from 1 Story’s Eq. relate to the ground of fraud, which will be considered presently. Those cited from 2 Id. relate to the ground we are now considering. In § 799 a, it is said, that “ if a plaintiff' in equity seeks the aid of the court to enforce his title against an innocent person, who has made improvements on land, supposing himself to be the absolute owner, that aid will be given to him only upon the terms that he shall make, due compensation to such innocent person, to the extent of the benefits which will be received from these improvements.” In § 779 b., after referring to the more liberal rule of the civil law in favor of a bona fide possessor of land, whose title is defective, and who claims compensation for improvements made by him upon the land in good faith against the true owner, who asserts his title to it, the writer says: “ But courts of equity *297 seem not to have gone to this extent, but to have confined themselves simply to the administration of the equity in cases where their aid. has been invoked by the true owner in support of his equitable claims. They have never enforced, in a direct suit by the bona fide possessor, bis claim to meliorations of the property from which he has been evicted by the true owner.” To the same effect are §§ 1237 and 1238; and in the latter it is said: “ In all cases of this sort, however, the doctrine proceeds upon the ground, either that there is some fraud, or that the aid of a court of equity is required; for if a party can recover the estate at lawq a court of equity wall not, unless there is some fraud, relieve a purchaser or bona fide possessor on account of money laid out in repairs and improvements.” "What 'is said in regard to fraud will be noticed presently. In regard to the rest of what is said in these sections, we think that nothing can be found therein to sustain the claim of the appellants. These sections relate to improvements made by a bona fide purchaser or possessor of the land on which they are made for his own use. Here the building was erected by persons who were neither purchasers nor possessors of the land, and not for their own use, but for the use of another, who was in possession of the land as an apparent owner, and with whom a contract was made by them for the erection of the building. Relief is afforded under these sections only upon the principle (except in cases of fraud) that he who asks equity mnst do equity. Here there is no room for the application of that principle. Cullen does not ask equity, in the sense of this principle. His trustee was clothed with the legal title, and might have recovered possession of the land at law, if it had been held adversely to him; but it was not. He was virtually in possession when he made the sale, *298 anc^ Pl'irc^asers 110 equity which they could claim against him in the sense of the said principle.
In Putnam v. Ritchie, 6 Paige’s R. 390, referred to in a note to § 799 b, supra, Chancellor Walworth said: principle of natural equity is constantly acted in this court, where the legal title is in one person, w|j0 jjas made the improvements in good faith, and where the equitable title is in another, who is obliged to resort to this court for relief. The court in such cases acts upon the principle, that the party who comes here, as a complainant, to ask equity, must himself be willing to do what is equitable. I have not, however, been able to find any case, either in this country or in England, wherein the court of Chancery has assumed jurisdiction to give relief to a complainant who has made improvements upon land, the legal title to which w as in the defendant; where there has been neither fraud nor acquiescence on the part of the latter, after he had knowledge of his legal rights. I do not, therefore, feel myself authorized to introduce a new principle into the law of this court without the sanction of the Legislature, which principle, in its application to future cases, might be productive of more injury than benefit.”
On the other hand, Judge Story, in Bright v. Boyd, 1 Story R. 478, 494, a case very much relied on by the counsel for the appellants in this case, said: “The other question as to the right of the purchaser, bona fide and for a valuable consideration, to compensation for permanent improvements made upon the estate, which have greatly enhanced its value, under a title which turns out defective, he having no notice of the defect, is one upon which, lookii g to the authorities, I should be inclined to pause.” “Iam aware that the doctrine has not, as yet, been carried to such an extent in our courts of equity.” After stating the in stances in which relief is *299 afforded, to a defendant for such improvements, upon the maxim that he who seeks equity must do equity, he further said: “But it has been supposed that courts of equity do not and ought not to go further, and to grant active relief in favor of such a bona fide possessor, making permanent meliorations and improvements, by sustaining a bill, brought by him therefor, against the true owner, after he has recovered the premises at law. I find that Mr. Chancellor Walworth in Putnam v. Richie (cited supra) entertained this opinion; admitting, at the same time, that he could find no case in England or Amei'iea where the point had been expressed or decided either way. Eow if there be no authority against the doctrine, I confess that I should be most reluctant to be the first judge to lead to such a decision. It appears to me, speaking with all deference to other opinions, that the denial of all such compensation to such bona fide purchaser in such a case, where he has manilestly added to the permanent value of an estate by his meliorations and improvements, without the slightest suspicion of any infirmity in his own title, is contrary to the first principles of equity.” The court accordingly, in that case, which was one of extraordinary hardship, gave such active relief to a bona fide pm> chaser, suing for the same against the owner who had recovered the estate in an action at law against the purchaser. Seé the same case in 2 Story’s R. p. 605. “This,” said the] Judge, “is the clear result of the Roman law; and it has the most persuasive equity, and I may add common sense and common justice for its foundation. The Betterment Acts (as they are commonly called) of the States of Massachusetts and Maine and of some other States, are founded upon the like equity, and were manifestly intended to support it, even in suits at law for the recovery of the estate.” This *300 decision of Judge Story seems to be contrary to wbat is laid down by liim as law in 2 Story’s Eq. Ju. § 1238, ■ already referred to, and we are not aware that it has been followed in any subsequent case. ¥e do not mean to say,however, that it would not be followed; especially this State; in which the provision of the Betterment Acts, or some of them, seem to have been substantially copied in chapters 135 and 136 of the Code. But we express no opinion upon that question, because it is unnecessary to the decision of this case.
If the decision in Bright v. Boyd correctly expounds the law, it does not govern this case. The two cases are very different, as perhaps plainly appears from what has already been said. There the party who made the improvements was in possession of the estate as bona fide purchaser claiming title to it, and having no notice of any defect in his title. Here the party who erected the building on the land subject to Cullen’s deed of trust, was not in possession of the land, and claimed no title to it. He claims to have erected the building upon an understanding or agreement with Graeme, the mortga-. ■gor, as he may be called, that the cost of the building should be secured by a lien on the land when the building should be completed, and that until the greater part of the work was done, the builder had no knowledge of Cullen’s lien. Was he not bound, like any other party contracting for a lien on real estate, to search the record to ascertain whether there were any prior liens upon the estate ? Suppose he had loaned money to Graeme, and taken a deed of trust on the estate to secure the loan, not having actual notice of the prior lien of Cullen, though duly recorded; would not his lien have been subordinate to Cullen’s lien? Can it make any difference that the debt for the security of which he contracted to take a lien, was a debt due for work and labor *301 done and materials found, and not for money loaned? He does not claim a lien upon the ground that the mere erection of the building by him at the request of Graeme entitled him to such lieu. Suppose that, having perfect confidence in Graeme’s ability and willingness to pay for the building, he had erected it upon the personal credit of Graeme; could he then have claimed to be entitled to a lien upon the land or the building, even as against Graeme, much less as against Cullen, who had a prior duly recorded lien on the land, and who had made no contract or request in regard to the building? Certainly not. And this shows that a lien for the cost of the building in such a case must spring, not from any vague idea that whenever a house is put by one man upon another’s land there is an equitable lien upon the house for the cost of building it, but from the contract and consent of the parties concerned, as was said by the Supreme court in Kutler v. Smith, 2 Wall, A. S. R. 491. “The well settled rule is that such erections as this become a part of the land, as each stone and brick are added to the structure. The only exceptions to this rule are, the class of fixtures already adverted to, and such rights as may grow out of express contract.”
Here then is a contest for priority between two lienors, Cullen and the Adams’, each of them claiming under a contract which the law requires to be recorded. The Adams’ was not recorded, and moreover was entered into bv them with full knowledge of the existence of Cullen’s lien; which knowledge of itself, without the registration of that lien; would have given it-priority. Can there be a doubt as to Cullen’s right of priority in this case? We clearly think not; unless he has postponed that right by fraudulent conduct on his part. And we will therefore now consider:
*302 Secondly: As to the ground relied on by the appellants, that Cullen was aware that the Adams’ were doing the work, relying for their security on a lien to be given on the lot, and yet failed to inform them of his deed of trust; and so was guilty of a fraud, by reason of which his lien will be postponed by a court of equity to theirs.
There can be no difficulty about the law which is to govern this question. The only difficulty which can arise upon it must he about the facts. The law is correctly laid down in 1 Story’s Eq. Ju. §§ 385-390, before referred to; and that part of the law which especially applies to this case, may, he found in §§ 385, 388, 389 and 390. Thus in § 385,it,is said: “In many cases a man may innocently he silent; for as has often been observed, aliud est lacere, aliud celare. But in other cases a man is bound to speak out; and his very silence becomes as expressive as if he had openly consented to what is said or done, and had become a party to the transaction. Thus, if a man, having a title to an estate, which is offered for'sale, and knowing his title, stands by and encourages the sale, or does not for hid it, and thereby another person is induced to purchase the estate, under the supposition that.the title is good, the former so standing by, and being silent, will be hound by the sale; and neither he nor his privies will be at liberty to dispute the validity of the purchase.” “ So if a party having a title to an estate, should stand by, and allow an innocent purchaser to expend money upon the estate, without giving him notice, he would not he permitted by a court of equity to assert that title against such purchaser, at least not without fully indemnifying him for all his expenditures.” In § 388, it is said: “Another case, illustrative of the same doctrine, may be put, arising from the expenditure of money upon *303 another man’s estate, through inadvertence or’ a mistake of title; as for instance, if a man, supposing he has an absolute title to an estate, should build upon the land, with the knowledge of the true owner, who should stand by and suffer the erections to proceed, without giving any notice of his own claim, he would not be permitted to avail himself of such improvements, without paying a full compensation therefor; for in conscience he was bound to disclose the defect of title to the builder.” And in § 390, it is said: “A more common case illustrative of the same doctrine, is where a person, having an encumbrance or security upon an estate, suffers the owner to procure additional money upon the estate by way of lien or mortgage, concealing his prior encumbrance or security. In such a case he will he postponed to the second encumbrancer; for it would be inequitable to allowr him to profit by his own wrong in concealing Ms claim, and thus lending encouragement to the new loan.”
This being the law bearing upon this part of the case, let us now see what is the charge of fraud, and what is the evidence relied on to sustain the charge.
. Substantially the charge is this: that Cullen saw the building while it was being constructed by the Adams’; that he knew Graeme had no means of paying for the building, or securing such payment, but by giving a lien on the lot; that he gave no notice of his deed of trust to the builders, as it was his duty to do, but on the contrary purposely remained silent on the subject, hi order, as is plainly implied, if not expressly charged, that the builders, in ignorance of his prior lien, might proceed to complete the building, and thus increase and perfect his security. If this charge- had been proved by the evidence, the complainants might have made good them ground of fraud, though it is unnecessary to decide *304 that question in this ease, and we do not mean to do SO.
But whafiis the evidence? There is none whatever on the subject, but that of Cullen himself. The building was commenced in June or July 1865. Cullen on the subject as follows:
3d question by counsel for defendants, on his examina- “ Where were you in the summer of -(¿on chief.. the year 1865 ?
Ans. I was in Richmond until the 12th day of June, and was in extremely bad health for a month previously to that date. On that day I left for Yew York, having been carried on board the steam vessel, and remained in Yew-York until the 30th day of the following September.
4th question by same. When did it first come to your knowledge that a house was going up on the lot in quesr tion in this suit—I mean the lot you have spoken of as sold by you to Mr. Grseme ?
Ans. I can’t positively say; but I suppose I saw it when it was visible—that is, when the building was some height above the level of the street. Being still in feeble health, I was not as much about the city, as was my wont, for some weeks after my arrival; and also having been engaged in the repairing of a house in which I then lived, with the intention of selling it; which I afterwards did.
5th question by same. In what way did you come to the knowledge that the Messrs. Adams had any interest in the lot ?
Ans. The first knowledge I had of it, or of the Messrs. Adams, was communicated to me by my nephew, Dr. Dorsey Cullen, whom I met on the Main street of Richmond some four weeks after my arrival; the precise time, at this distance of time, I cannot deter *305 mine. He informed me that he had just parted with a Mr. Adams, of Baltimore, who stated to him that he was putting up houses for Mr. Graeme, and that he understood that I had a hen on one of the lots, and that he should like to know what I would take for the bonds that were given to secure said lien.
6th question. "What were your relations with Mr. John Graeme, sr.?
Answer. I had no intercourse with Graeme, directly or indirectly, from February 1864.
7th question. Were you on good or bad terms with him?
Answer. In consequence of a nefarious attempt to rob me of my property, by applying in the aforesaid month of February 1864 to the confederate court to confiscate it, of course I was not on good terms with .him.
10th by same. What knowledge had you of the terms on which the Messrs. Adams were building the house on the said lot?
Answer. Hone whatever. I did not know one of the Messrs. Adams’ till the month of May last (1868 ) I was introduced to one of them, whose name I do not know.
1st question on cross-examination by counsel for S. H. and J. F. Adams. When it came to your knowledge that the Messrs. Adams were building houses upon Mr. Graeme’s property, did you acquaint them, or any person acting for them, with the existence of your lien upon a paid of the property?
Answer. I did not think it necessary, inasmuch as I relied upon my lien to secure my debt. I came to' Eichmond for the purpose of winding up my affairs and requesting a sale of the lot, but I found the stay law interposed and prevented its sale.
*306 ^ <lues^on ^y same. You say that you clidL not think it necessary; clo you mean to be understood that you did not in fact take any stops to acquaint the Messrs. Adams with the existence of your lien upon 8a^ ProPerty •
Answer. I did not; because I was under the impression they already knew it, from the statement made to my nephew; being the first time I knew of any lien, and thereby ascertaining that he was aware of my lien, .1 did not think it necessary. I will here remark that I believe the buildings were very near completion at that time.
7th by same. Did you have any information until you returned to Richmond in the September following (1865,) that any building was going up on said lot?
Answer. None whatever; I expected on my return to have the lot sold by virtue of my lien.
9th by same. Was not your trustee and counsel, Mr. Myers, a resident of Richmond during the summer andfall of 1865?
Answer. Mr. Myers was, I believe, here in 1865; I am not Mr. Myers’ keeper. He was my trustee, but not my counsel in that case; not having any occasion for law advice in it. Nor was Mr. Myers my general attorney; having no power to act for me in any case without specific directions.”
This is the evidence. Does it sustain the charge of fraud ? We think it clearly does not. There ought to be strong, proof to sustain a charge of fraud. We do not think the evidence in this case warrants even a suspicion of fraud on the part of Cullen. He knew nothing of the building until the greater part of it was completed. He knew nothing of the arrangement which Graeme had made for its construction, nor that the Messrs. Adams had any thing to do with it, until after *307 they were fully apprised of his prior lien. He had caused that lien to be duly recorded, and had good reason to believe, and no doubt .did believe, if he thought at all on the subject, that any person who might contract with Graeme for the erection of the building upon the faith of a lien to be taken on the property to secure the payment of the price of the work, would use the obvious and necessary precaution to examine the record, to see if there were any prior liens on the property; which could so readily be done. He might well have taken it for granted, and no doubt did, if he thought at all on the subject, that Graeme, whose duty it was to do so, had fully informed the contractor for the work of the prior lien on the property, if it was intended to give such contractor also a lien on the property for his security. Goddin proves that when Graeme entered upon the erection of the building, the lot eould have been sold for about enough to have paid the whole balance then due Cullen; and that he regarded Graeme as a gentleman of undoubted solvency and of excellent credit. The Messrs. Adams might have been willing, so far as Cullen knew, to do the work on the credit of Graeme’s interest in the property and on the personal credit of Graeme, or even on the latter alone. It is not uncommon for work of this kind, as well as any other, to be done on personal credit only. It was not incumbent on Cullen to enquire into this matter, when he had no suspicion, and no ground for suspicion, on the subject. He had done his whole duty in the matter by putting his deed of trust on record, where all concerned eould easily see it. It is a thing of every day occurence that a mortgagor improves the mortgaged premises, and that the improvement enures to the benefit, as well of the mortgagee' as of the mortgagor. Such improvements are rarely made by the mortgagor’s own hand, but gen *308 erally by•anhands of others employed by him for that purpose. Whether made by one or the other, they are his improvements; that is, in effect, made by him. And . . . when the mortgagor sees such improvements going on, ma7 in the absence of evidence to the that the mortgagor is making them, whether foy qqg 0W11 franq 0r the hands of others, on his own personal credit. The case is different where a man is in possession of another’s land, claiming it as his own, and ereciting valuable improvements upon it with the knowledge of the real owner. In such a case the owner knows that the man is acting under a mistake, and it is his duty to give notice of his title. If he stand silently by, and permit the party to go on with the work under such mistake, it will be a fraud in him, and create an equitable estoppel against him.
But we deem it unnecessary to say any thing more on. this subject, and are of opinion that the ground of fraud relied on by the appellants has not been sustained.
Only one or two more points remain to be noticed; and upon them little will be said. '
One of them is, that there was a policy of insurance existing upon the house which stood upon the lot when the deed of trust for Cullen’s benefit was executed, and which was burned down by the great fire of the 3d of April 1865; that the insurance company is liable for the loss; that the liability is covered by the deed of trust; and that Cullen is bound to have that liability enforced, before he can subject the proceeds of the sale of the lot to the payment of his debt. In other words, he is regarded by the counsel for the appellants, as the assignee of that claim, and as bound to use diligence in endeavoring to recover it. We do not think that such is the ease. It is altogether uncertain whether any liability at all exists on that policy to - *309 any body. The policy was transferred by Cullen to Graeme in 1860, about the time of the execution of the deed by which the property was conveyed by the former to the latter. It is not mentioned in the deed of trust, and seems to have remained in the possession of Graeme ever since it was first transferred to him. Indeed, it appears that Graeme has actually instituted suit upon it to enforce the supposed liability aforesaid. At all events, conceding that the liability exists, and that it is virtually assigned by the deed of-trust, it is a mere collateral security; and there is no obligation on Cullen to embark in an expensive and protracted litigation to enforce it before he can have the property conveyed by the deed of trust sold,. and the proceeds of sale applied to the payment of his debt, in pursuance of the terms of the deed. If such liability exists, it can be enforced by Graeme or his assigns, as they may be advised.
Another, and the only remaining point, is, that by the decree appealed from, compound interest, on a considerable portion of Cullen’s debt, is allowed. It is said “that interest is allowed on bonds given for interest, and on bonds past due, including principal and interest on their face.” The court is of opinion that there is no error in the decree in this respect—at least to the prejudice of the appellants. And we do not understand the appellees as complaining of such error. See Kraher v. Shields, 20 Gratt. 377-398; and Græme v. Adams, decided during the present term.
Upon the whole, we are of opinion that there is no error in the decree appealed from, and that it ought to be affirmed.
Decree aeeirmed.